2022 IL App (3d) 190281

Opinion filed February 18, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0281 Circuit No. 17-CF-348 |
| SHAUN N. TAYLOR, | ) ) ) | |
| Defendant-Appellant. | ) ) | Honorable Terence M. Patton, Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justice Holdridge concurred in the judgment and opinion.
Justice Lytton dissented, with opinion.

**OPINION**

¶ 1        Defendant Shaun N. Taylor appeals from his conviction of attempted first degree murder

of a peace officer. The lower court sentenced defendant to 30 years in prison plus an additional 20

years for using a firearm during the commission of the offense. On appeal, he argues that (1) the

trial court erred in denying his request for a second expert to evaluate his mental state at the time

he committed the offense and (2) the 20-year firearm enhancement for attempted murder of a peace

officer does not apply. For the reasons that follow, we affirm.

¶ 2                                I. BACKGROUND

¶ 3 Defendant was charged with one count of attempted first degree murder of a peace officer (720 ILCS 5/8-4(a), (c)(1)(A), 9-1 (West 2016)) and one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)) for shooting at Illinois State Police Trooper Andrew Scott after Scott initiated a traffic stop of defendant's vehicle. Prior to trial, the court appointed clinical psychologist Dr. Kirk Witherspoon to examine defendant and determine whether he was fit to stand trial and whether he could raise the defense of not guilty by reason of insanity (NGRI). Witherspoon conducted an evaluation and diagnosed defendant as suffering from posttraumatic stress disorder stemming from his military service in Afghanistan. Applying multiple psychological factors, Witherspoon concluded that defendant was fit for trial and failed to meet the threshold for asserting the defense of NGRI. In an addendum to his report, Witherspoon noted that defendant reported using "psychostimulants" to stay awake while driving at the time of his arrest. Witherspoon stated that the ingestion of such stimulants would, in his opinion, preclude defendant's ability to plead not guilty by reason of insanity. Witherspoon concluded that, in the event defendant was found guilty, a guilty-but-mentally-ill presumption would apply. Specifically, he recommended that defendant "be considered as reasonably experiencing significant and debilitating posttraumatic stress disorder, irrespective of psychostimulant use, relative to adjudicatory and dispositional considerations."

¶ 4 In addition to his report, Witherspoon provided defense counsel with a handwritten note, opining:

> "Mr. Taylor is a borderline case. I do not think he meets the threshold of NGRI. However, if his parents can afford it, you may wish to seek a second opinion. If so, I can give you the names of a couple of other good psychologists who can do this work."

¶ 5        In response to Witherspoon's note, defendant filed a motion requesting the appointment of a psychologist, at the State's expense, to conduct an evaluation and provide a second opinion as to his mental state at the time he committed the offense. In support of his motion, defendant cited Witherspoon's report, the addendum, and the handwritten note.

¶ 6        Following a hearing on the motion, the trial court denied defendant's request. The court found that defendant had met the threshold requirement of establishing that he was indigent. It then discussed whether there was a need for a second expert. The court noted that defendant had already been evaluated by Witherspoon at the State's expense with Witherspoon finding defendant did not meet the requirements of an insanity defense. The court noted that Witherspoon's report did not include a recommendation that the court appoint another evaluator. The court emphasized that, in prior cases, Witherspoon's report included a recommendation for a second evaluation if needed and found that the psychologist's failure to do so in this case was significant.

¶ 7        At trial, evidence revealed that Scott stopped defendant on Interstate 80 around 9:30 p.m. on October 15, 2017. Defendant was traveling from the state of Washington to Massachusetts. Scott approached defendant's vehicle, identified himself as an Illinois State Trooper, and informed defendant that he was going to give him a warning. He asked defendant to return to the squad car with him, but defendant declined the invitation. While Scott was preparing the warning, another officer arrived with a canine unit. The officer walked around defendant's vehicle, and the dog alerted. Scott and the other officer then approached the vehicle and asked defendant to exit the car. Instead, defendant sped off.

¶ 8        Defendant pulled off the interstate at a nearby exit and parked his car on a country road. He grabbed his AR-15 semiautomatic rifle and a .40-caliber handgun and took a position with a line of sight of his vehicle in a nearby cornfield. Moments later, Scott pulled up behind defendant's

vehicle. He exited his squad car but did not approach defendant's vehicle, instead, moving toward the back of his squad car. That is when defendant fired 23 shots in Scott's direction with the semiautomatic rifle. Scott survived the incident unharmed. Law enforcement pursued defendant on foot. Several hours later, defendant surrendered.

¶ 9     The jury found defendant guilty of attempted murder of a peace officer and aggravated discharge of a firearm. The trial court merged the aggravated discharge conviction into the attempted murder conviction.

¶ 10     Prior to sentencing, the court entertained argument on the propriety of applying a 20-year enhancement to defendant's sentence for personally discharging a firearm. The State focused on the term "shall" in the firearm enhancement language and argued it was mandatory. Defendant argued that application of the firearm enhancement would constitute a double enhancement under the statute given that he was already subject to the enhanced sentencing range of 20 to 80 years.

¶ 11     Relying on *People v. Jackson*, 2018 IL App (1st) 150487, and *People v. Tolentino*, 409 Ill. App. 3d 598 (2011), the court found the 20-year enhancement would not constitute a double enhancement. Specifically, the court stated,

> "When the victim is a peace officer, the sentencing range is enhanced in recognition of the heightened risk officers take in performing their duties, seeking to deter the intentional killings of police officers. The 20-year firearm enhancement, the purpose of that is to deter the use of firearms in the commission of felonies due to the greater risk posed by their use. So the Court found that those are designed to address different situations; therefore, it's not a double enhancement to impose both[.]"

¶ 12    The court imposed an aggregate term of 50 years in prison. The court's sentence consisted of a 30-year term under section 8-4(c)(1)(A) of the attempt statute based on Scott's status as a peace officer plus a 20-year firearm enhancement under section 8-4(c)(1)(C) for defendant's personal discharge of a firearm. 720 ILCS 5/8-4(c)(1)(A), (C) (West 2016).

¶ 13    Defendant appeals.

¶ 14                                  II. ANALYSIS

¶ 15                        A. Request for Second Expert Opinion

¶ 16    Defendant argues the trial court erred in denying his request for the appointment of a second expert to determine whether he was insane at the time of the offense.

¶ 17    A defendant has a constitutional right to present a complete defense and compel necessary witnesses on his or her behalf regardless of a defendant's ability to pay. *People v. Lawson*, 163 Ill. 2d 187, 220 (1994). An indigent defendant, however, is not entitled to an expert merely because the expert would be useful, helpful, valuable, or important to the defense. *People v. Shelton*, 401 Ill. App. 3d 564, 575 (2010). The defendant must show that the requested expert assistance is necessary in proving a crucial issue in the case and that the lack of funds for the expert will therefore prejudice him. *Lawson*, 163 Ill. 2d at 221. We review a trial court's denial of a motion for an expert witness for an abuse of discretion. *In re Commitment of Lingle*, 2018 IL App (4th) 170404, ¶ 39. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 18    In *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), the United State Supreme Court established that, "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a

5

competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." In Illinois, a defendant's right of access to a psychiatric examination is protected by statute as well. Under section 115-6 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-6 (West 2020)), if a defendant indicates that he or she may rely on the defense of insanity or plead guilty but mentally ill, "the Court shall *** order the defendant to submit to examination by at least one clinical psychologist or psychiatrist." Section 115-6 also provides that the trial court "may order additional examinations if the Court finds that additional examinations by additional experts will be of substantial value in the determination of issues of insanity or drugged conditions." *Id.*

¶ 19        In this case, the requirements of *Ake* have been met. Defendant demonstrated that he was indigent and that his sanity was to be a significant issue at trial. Thus, the State was required to provide defendant with access to a psychiatric evaluation. See *Ake*, 470 U.S. at 86. The trial court appointed Witherspoon at the State's expense to determine whether defendant was sane at the time he committed the offense, fulfilling the mandate of *Ake*. Witherspoon, a clinical psychologist, conducted a thorough evaluation of defendant's mental condition and reported that defendant was not insane when he fired upon Scott.

¶ 20        In his report, Witherspoon stated that he interviewed defendant on two occasions. Defendant was well oriented for person, place, and time, showing no signs of hallucinations or delusions. Based on several mental assessment procedures, including a mental status exam and the Million Clinical Multiaxial Inventory-III, Witherspoon opined that defendant suffered from bipolar I disorder, in partial remission, and severe posttraumatic stress disorder. In relation to defendant's sanity at the time of the offense, Witherspoon reviewed the case file and police interviews and reported that defendant's actions were based on paranoia and fear. He stated that,

6

although defendant had paranoid thoughts, his self-defense motive did not comport with the nature of his calm and compliant surrender to police. Defendant was able to reflect on his actions and describe the events of that day; he described paranoid but rational behavior. Based on his evaluation, Witherspoon concluded that defendant's actions did not reflect psychosis or a degree of irrationality that would have prevented him from understanding the criminality of his behavior. In other words, his behavior did not demonstrate insanity. Witherspoon's addendum also states that defendant's condition did not meet the clinical threshold to present the defense of NGRI. Witherspoon's evaluation indicates that he carefully studied the mental examination data, considered the investigative reports, and analyzed the evaluation of defendant in light of these records. It is for those reasons we cannot conclude that the denial to appoint an additional psychiatric expert was an abuse of discretion.

¶ 21    Defendant maintains that Witherspoon's reference to defendant's case as "borderline" in his handwritten note to defense counsel required the trial court to order a second evaluation, at the State's expense. However, given the information submitted by Witherspoon after examining defendant, there was no substantial value in ordering another evaluation. Although an additional expert witness may have been helpful to defendant, the State was not required to finance the assistance to assure defendant's access to a complete defense. See *Lingle*, 2018 IL App (4th) 170404, ¶ 42 (finding that second expert was not required where first expert provided thorough evaluation and diagnosis). Accordingly, the trial court's failure to approve additional funds for further psychiatric evaluation did not amount to an abuse of discretion.

¶ 22                              B. 20-Year Firearm Enhancement

¶ 23    Next, defendant challenges his sentence. He claims that the trial court erred in applying both the status-based sentencing range under section 8-4(c)(1)(A) and the 20-year firearm

7

enhancement under section 8-4(c)(1)(C) of the attempt statute when formulating his sentence for attempted first degree murder of a peace officer. 720 ILCS 5/804(c)(1)(A), (C) (West 2020). He argues that, once a sentencing court applies the status-based 20- to 80-year sentencing range in subsection (A), the other subsections of the attempted first degree murder statute cannot apply without running afoul of the prohibition against double enhancements.

¶ 24    Defendant notes a split of authority on this issue, citing *People v. Phagan*, 2019 IL App (1st) 153031, *leave to appeal denied*, No. 125249 (Ill. Nov. 26, 2019); *People v. Holley*, 2019 IL App (1st) 161326, *leave to appeal denied*, No. 125078 (Ill. Sept. 25, 2019); and *People v. Douglas*, 371 Ill. App. 3d 21 (2007) (holding that, once a court applies the status-based sentencing range in section 8-4(c)(1)(A), it cannot apply a firearm enhancement) as compared to *Jackson*, 2018 IL App (1st) 150487, *leave to appeal denied*, No. 123784 (Ill. Sept. 26, 2018); *People v. Smith*, 2012 IL App (1st) 102354, *appeal denied*, No. 115292 (Ill. Jan. 30, 2013); and *Tolentino*, 409 Ill. App. 3d 598, *appeal denied*, No. 112553 (Ill. Sept. 28, 2011) (adopting a conjunctive reading of the attempt statute, allowing application of the sentencing range in section 8-4(c)(1)(A) as well as a firearm enhancement). Defendant urges us to follow the *Phagan* line of cases and vacate the 20-year firearm enhancement from his sentence.

¶ 25    The Illinois attempt statute sets forth the elements of attempt and provides sentencing guidelines for attempted offenses, including first degree murder. Section 8-4(c)(1) states:

"[T]he sentence for attempt to commit first degree murder is the sentence

for a Class X felony, except that

(A) an attempt to commit first degree murder when at least one of

the aggravating factors specified in paragraphs (1), (2), and (12) of

subsection (b) of Section 9-1 is present is a Class X felony for which the

sentence shall be a term of imprisonment of not less than 20 years and not more than 80 years;

(B) an attempt to commit first degree murder while armed with a firearm is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court;

(C) an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court;

(D) an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court; and

(E) if the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony[.]" 720 ILCS 5/8-4(c)(1)(A)-(E) (West 2020).

9

¶ 26　　　　We apply the *de novo* standard of review when construing a statute. *Jackson*, 2018 IL App (1st) 150487, ¶ 47. The primary objective of statutory construction is to ascertain and give effect to the legislature's intent. *People v. Casler*, 2020 IL 125117, ¶ 24. All other rules of statutory construction are subordinate to this principle. *Id.* "In determining the intent of the legislature, the court may properly consider not only the language of the statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved." *People v. Frieberg*, 147 Ill. 2d 326, 345-46 (1992). While penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. *People v. Kirkrand*, 397 Ill. 588, 590 (1947). We construe statutes presuming the legislature did not intend absurd, unjust, or inconvenient results. *People v. Lewis*, 234 Ill. 2d 32, 44 (2009).

¶ 27　　　　When presented with a similar issue regarding the attempt statute, Justice Wolfson writing for a unanimous court in *Douglas*, 371 Ill. App. 3d 21, found that section 8-4(c)(1)(A) was not an enhancement but, rather, the enhancements were contained in the following subsections of (B), (C), and (D). *Id.* at 26. At this point in his analysis, Justice Wolfson was one for one. Nonetheless, the *Douglas* court went on to preclude the application of the firearm enhancements by engaging in presumptions of what the legislature may have intended. See *id.* ("[T]he legislature well might have believed it was authorizing trial judges to impose severe sentences."). By engaging in speculation regarding the legislature's intent, Justice Wolfson ended up only batting 0.500 on his analysis, which is not bad considering not even Babe Ruth achieved that average.[1]

¶ 28　　　　Next came *Tolentino*, 409 Ill. App. 3d 598. The court in *Tolentino* agreed that the analysis in *Douglas* was only partially correct, finding that speculation as to what the legislature "might

---

[1] Babe Ruth only achieved a career batting average of 0.342. Major League Baseball, https://www.mlb.com/search?q =babe%20ruth&playerId=121578 (last visited Feb. 14, 2022) [https://perma.cc/DR6X-TU6U].

have believed" was *dicta* and declined to follow it. *Id.* at 606. Analyzing the statute, the court found no express prohibition on the application of the firearm enhancements when sentencing under section 8-4(c)(1)(A). *Id.* The court also delineated that the public policy concerns underlying section 8-4(c)(1)(A) differ from those underlying the firearm enhancement provisions. *Id.*

¶ 29      The attempt statute was amended in 2010, adding section 8-4(c)(1)(E) along with the now infamous "and." Pub. Act 96-710, § 25 (eff. Jan. 1, 2010) (amending 720 ILCS 5/8-4(c)(1)). The *Jackson* court had the first crack at interpreting the amended statute. *Jackson*, 2018 IL App (1st) 150487. The court conceded the use of semicolons between the subsections signaled a disjunctive reading was appropriate, only allowing one subsection to apply to a given case. *Id.* ¶ 51. Nonetheless, the use of "and" before section 8-4(c)(1)(E) signaled that the General Assembly intended for section (c)(1)'s exceptions to apply conjunctively, not disjunctively. *Id.* The court held that the most natural reading was that section 8-4(c)(1)(A) was the baseline sentence with one of the firearm enhancements applying based on the facts of the case. *Id.* ¶ 52.

¶ 30      In 2019, the appellate court came to the opposite result, first in *Phagan* and then in *Holley*. In those cases, the appellate court indulged in a disjunctive reading of the statute precluding the application of a firearm enhancement to a sentence under section 8-4(c)(1)(A).

¶ 31      Turning to *Phagan*, the decision in that case is full of tortured reasoning that overlooks the plain language of the statute. One example of this obfuscation is the detour into the discussion of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Phagan*, 2019 IL App (1st) 153031, ¶ 88. *Apprendi* is irrelevant to the issues in either *Phagan* or this case. *Apprendi* is not dispositive as to whether section 8-4(c)(1)(A) is a sentencing enhancement, as *Apprendi* stands for the proposition that a sentencing enhancement still must be proven beyond a reasonable doubt. Pointing to the State's compliance with *Apprendi* in finding section 8-4(c)(1)(A) a nonelement sentencing enhancement

11

is illogical when the State needed to advance proof beyond a reasonable doubt regardless of the statutory section's classification. *Id.*

¶ 32 When addressing the merits, *Phagan* disparaged the analysis in *Jackson* because of the failure to address the content of section 8-4(c)(1)(E). *Id.* ¶ 100. Once engaged in statutory construction, *Phagan* found that reading subsection (E) with the other subsections conjunctively, as the court did in *Jackson*, brought about "absurd results." *Id.* ¶ 101. The court then turned its attention to subsections (B) through (D), finding a conjunctive reading equally absurd owing to the fact a sentencing court could apply all three of the firearm enhancements if the State proved the facts necessary to apply the most serious of the three. *Id.* Both of these alleged problems were solved at once by a disjunctive reading of subsections (A) through (E). *Id.* ¶ 103.

¶ 33 *Phagan* was wrongly decided.[2] A review of section 8-4(c)(1)(A)-(E) of the Criminal Code of 2012 (720 ILCS 5/8-4(c)(1)(A)-(E) (West 2020)) makes clear that section 8-4(c)(1)(A) is not an enhancement but, rather, the base sentencing range for a status-based offense such as the one at issue. The plain unambiguous language of the statute states that in the presence of certain aggravating factors, while still a Class X felony, "the *sentence* shall be a term of imprisonment of not less than 20 years and not more than 80 years." (Emphasis added.) *Id.* § 8-4(c)(1)(A); *Smith*, 2012 IL App (1st) 102354, ¶¶ 110-16. Common sense dictates that the 20 to 80-year baseline

---

[2] The *Phagan* court's finding that it could merely vacate the firearm enhancement absent a remand for resentencing is also incorrect. Courts craft terms of imprisonment mindful of firearm enhancements, thereby reaching a just sentence for the accused offense. There is no need to cite authority for this contention as experience and logic are adequate support. *Phagan* provides a defendant the unjust windfall of vacating the mandatory enhancement absent remand for resentencing. *Phagan* improperly relied on one act, one crime principles in arriving at the conclusion the court could vacate the less severe of the enhancements and forego resentencing. What does one act, one crime principles have to do with this issue? That's right: nothing! It is apparent that the lower court in this case did not view a 30-year sentence, only 4 years above the minimum for the same offense not committed against a peace officer a just result. It is more than likely that had the trial judge known the 20-year firearm enhancement was inapplicable, he would have sentenced defendant differently under section 8-4(c)(1)(A). When a firearm enhancement is vacated, the cause should be remanded for resentencing.

sentence is not an enhancement. This interpretation is enforced by the remainder of the statute with subsections (B), (C), and (D) of section 8-4(c)(1) setting forth sentence enhancements that "shall be added" to whichever sentence range is applicable for the Class X felony. 720 ILCS 5/8-4(c)(1)(B)-(D) (West 2020); *Smith*, 2012 IL App (1st) 102354, ¶¶ 110-16. Absent from the statute is language prohibiting the imposition of the firearm enhancements. *Smith*, 2012 IL App (1st) 102354, ¶ 115.

¶ 34        Further, supporting this interpretation are the separate evils sought to be prevented by the status-based offense and the firearm enhancements. The legislature has been explicit in its intent to punish attempt first degree murder of a peace officer more severely than the same attempt on an ordinary citizen. Moreover, the legislature has clearly expressed its intent to punish offenses perpetrated with firearms with sentencing enhancements. See *id.* (noting public policy concern of section 8-4(c)(1)(A) is to deter the intentional killing of peace officers who take heightened risks in performing their duties, as opposed to the policy concerns underlying the following subsections of (B), (C), and (D) that are meant to deter the use of firearms in the commission of felonies due to the greater risk their use poses to society at large); see also *Tolentino*, 409 Ill. App. 3d at 606; *People v. Felton*, 2019 IL App (3d) 150595, ¶ 64. There is more than one way to attempt to take the life of a peace officer. An attempt first degree murder of a peace officer using an AR-15 should be punished more harshly than the same attempt using a butter knife. Any speculation that the legislature has already contemplated the use of firearms in an attempt to commit first degree murder of a peace offer and has addressed those concerns via the 20 to 80-year sentencing range is unwarranted. See *Smith*, 2012 IL App (1st) 102354, ¶ 114.

¶ 35        As the State points out, if defendant in this case would have fired upon a civilian rather than the trooper, Class X sentencing would apply with a baseline sentence in the 6 to 30-year range

13

along with a mandatory 20-year firearm enhancement. The minimum possible sentence in that scenario is 26 years, 6 years more than the minimum allowed under section 8-4(c)(1)(A). The end result of the interpretation advocated by defendant would allow for an individual attempting to murder a peace officer while discharging a firearm to receive a sentence below the mandatory minimum sentence of an attempt first degree murder of an ordinary citizen under the same facts. This runs afoul of the legislative intent to punish these status-based crimes and crimes committed with a firearm more severely. Despite the legislature's express intent, defendant's interpretation of the statute leads to absurd results. To engage in this suggested reading would do nothing more than place form over substance.

¶ 36    Defendant points to the reasoning in *Phagan*, arguing that a conjunctive reading of the statute is impossible. First, he argues that a conjunctive reading of the statute would require the lower court to apply the 15, 20, and 25-year firearm enhancements in certain situations. Second, he notes the incompatibility of section 8-4(c)(1)(A) and section 8-4(c)(1)(E) under a conjunctive reading.

¶ 37    To the first point, having found from the plain language that section 8-4(c)(1)(A) is a base sentencing range, under a conjunctive reading, only one of the firearm enhancements can apply. This is because double enhancements to a sentence are prohibited unless the legislature clearly intended such a penalty and "that intention is clearly expressed" in the statute. *People v. Guevara*, 216 Ill. 2d 533, 545-46 (2005); see also *Jackson*, 2018 IL App (1st) 150487, ¶ 53 (noting we will not interpret a statute as permitting double enhancements). The *Jackson* court was correct in finding "unfounded" the notion that a court would apply all three of the firearm enhancements when the State was able to prove the most serious of the three. *Id.* The *Phagan* court conceded that there was no such case in which all three firearm enhancements were applied. *Phagan*, 2019 IL

14

App (1st) 153031, ¶ 102. We similarly find defendant's contention that a lower court would apply more than one firearm enhancement "unfounded." *Jackson*, 2018 IL App (1st) 150487, ¶ 53.

¶ 38    As to the second contention, the court in *Jackson* was on the right track when interpreting this statute, but as pointed out in *Phagan*, *Jackson* failed to address the content of section 8-4(c)(1)(E). The *Jackson* court conceded that the use of semicolons between the subsections generally indicate a disjunctive reading. *Id.* ¶ 51. This concession is perplexing as the use of a semicolon often replaces a coordinating conjunction, most often the word "and." Nonetheless, the *Jackson* court found that the use of "and" at the end of the series of subsections, before subsection (E), signaled the intent of the General Assembly for the subsections to be read conjunctively.

¶ 39    What the *Jackson* court left out is that the legislature at times has difficulty properly codifying its intent. See *Goldblatt v. City of Chicago*, 30 Ill. App. 2d 211, 217 (1961) ("The use of 'or' and 'and' is so frequently inaccurate in statutory enactments that the courts readily change 'or' to 'and' and vice versa, whenever such conversion is required by the context."). Section 8-4(c)(1)(E) is not an enhancement, rather, it describes mitigating circumstances that lessens the provided for Class X sentencing to that of a Class 1 felony. Similar to section 8-4(c)(1)(A), section 8-4(c)(1)(E) is a baseline sentence. In the presence of serious provocation, the sentencing court is instructed to treat the offense as a Class 1 felony, thereby rendering the firearm enhancements inapplicable. Although the legislature intended section 8-4(c)(1)(A) and the appropriate firearm enhancement that follows to apply in the cumulative as evidenced by the "and" before section 8-4(c)(1)(E), it is proper to read the "and" as an "or" in light of the content of section 8-4(c)(1)(E), allowing that section alone to apply disjunctively. See *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 606 (2008) ("In construing statutes, the strict meaning of words like 'and' 'is more readily departed from than that of other words.' " (quoting *John P. Moriarty, Inc. v. Murphy*, 387 Ill. 119, 129 (1944))); *Martin v. Office of the State's Attorney*, 2011 IL App

15

(1st) 102718, ¶ 11 ("[I]f reading 'and' in a statute literally would create an inconsistency in the statute or render the sense of the statute dubious, then the term 'and' will be read as 'or.' " (citing *County of Du Page*, 231 Ill. 2d at 606)). Ergo, subsection (A) is the baseline sentence in cases dealing with status-based offenses such as the one here, with either subsection (B), (C), or (D) also applying when a firearm is used in the commission of the offense.

¶ 40    Accordingly, the circuit court did not err in sentencing defendant.

¶ 41                             III. CONCLUSION

¶ 42    For the foregoing reasons, we affirm the judgment of the circuit court of Henry County.

¶ 43    Affirmed.

¶ 44    JUSTICE LYTTON, dissenting:

¶ 45    I concur with the finding that the trial court did not abuse its discretion in denying defendant's motion for a second expert regarding the determination of insanity at the time of the offense. However, I disagree with the majority's conclusion that the trial court appropriately applied both the status-based enhancement under section 8-4(c)(1)(A) and the 20-year firearm enhancement under section 8-4(c)(1)(C) to defendant's sentence for attempted first degree murder of a peace officer.

¶ 46                    IT IS ALL ABOUT THE SEMICOLONS

¶ 47    When interpreting a statute, our primary objective is to give effect to the legislature's intent, which we do by looking to the language in the statute and determining its plain and ordinary meaning. *Jackson*, 2018 IL App (1st) 150487, ¶ 48. In construing legislative intent, we must consider the entire statute in light of the subject it addresses, presuming the legislature did not intend absurd, unjust, or inconvenient results. *Lewis*, 234 Ill. 2d at 44. Double enhancements to a sentence are prohibited unless the legislature clearly intended such a penalty and "that intention is clearly expressed" in the statute. *People v. Guevara*, 216 Ill. 2d 533, 545-46 (2005).

16

¶ 48    In interpreting criminal statutes, we are mindful to apply the statutory language strictly in favor of the accused; nothing should be taken by implication beyond the plain and obvious meaning of the statute. *People v. Lavallier*, 187 Ill. 2d 464, 468 (1999). Thus, if a criminal statute is ambiguous, it will generally be construed in a defendant's favor. *People v. Johnson*, 2017 IL 120310, ¶ 30.

¶ 49    In this case, defendant argues that the 20-year enhancement for personally discharging a firearm does not apply to his conviction for attempted first degree murder of a peace officer because the plain language of the attempt statute only allows the court to impose one enhancement or the other, not both. See *Phagan*, 2019 IL App (1st) 153031, ¶ 103; *Holley*, 2019 IL App (1st) 161326, ¶ 32; and *Douglas*, 371 Ill. App. 3d at 26.

¶ 50    As a baseline, the plain language of the attempt statute requires attempted first degree murder to be sentenced as a Class X offense, carrying a sentencing range of 6 to 30 years. 720 ILCS 5/8-4(c)(1) (West 2020); 730 ILCS 5/5-4.5-25(a) (West 2020). The semicolons between the subsections that follow indicate that each exception must be read disjunctively. See *Jackson*, 2018 IL App (1st) 150487, ¶ 51 (conceding that the use of semicolons between subsections ordinarily means that the subsections are related but separate concepts that should be read disjunctively). If the victim is a peace officer, the statute increases the sentencing range to 20 to 80 years. 720 ILCS 5/8-4(c)(1)(A), 9-1(b)(1) (West 2020). If a firearm is used during the commission of the offense, the statute requires the imposition of an additional 15 years to the Class X sentence. *Id.* § 8-4(c)(1)(B). If the defendant personally discharges a firearm during the commission of the offense, the statute requires the imposition of an additional 20 years. *Id.* § 8-4(c)(1)(C). If the defendant's actions caused great bodily harm, permanent disability, permanent disfigurement, or death, the statute mandates the imposition of an additional 25 years. *Id.* § 8-4(c)(1)(D). However, if certain

17

mitigating factors are present, the sentence is reduced to the sentence for a Class 1 felony. *Id.* § 8-4(c)(1)(E). I believe each subsection applies separately, not collectively.

¶ 51        The placing of a semicolon at the end of each subsection and use of the word "and" between subsections (D) and (E) may seem confusing to some, but the grammatical structure of section 8-4(c)(1) as a whole is clear. The rules of punctuation in the English language are well defined. The semicolon is used to separate "two or more clauses which are of more or less equal importance" as a means of indicating discontinuity. The New Fowler's Modern English Usage 699 (R.W. Burchfield ed., 3d ed. 1996); Karen Elizabeth Gordon, The New Well-Tempered Sentence: A Punctuation Handbook for the Innocent, the Eager, and the Doomed 61 (1993). Its function is "to separate contact clauses—that is, clauses that are not linked by a conjunction." Theodore M. Bernstein, The Careful Writer; A Modern Guide to English Usage 373 (1965).

¶ 52        *Jackson* agrees with these rules but relies on the word "and" between subsection (D) and (E) to support a conjunctive interpretation. See *Jackson*, 2018 IL App (1st) 150487, ¶ 51. The majority follows *Jackson*, ignoring the purpose of the semicolon. Both, however, miss the point.

¶ 53        The use of a semicolon between each subsection is significant. A semicolon signals a stop; it forces the reader to contemplate each sentencing exception independently. A semicolon is not a comma. A comma indicates a pause, not a stop, and is used to combine elements in a series. Gordon, *supra* at 46 ("three or more elements in a series are separated by commas"); see also Bernstein, *supra* at 359 (discussing correlative conjunctions and the use of commas to combine related material in a series). Unlike commas, nothing in the rules of punctuation suggests that the use of a semicolon allows for a conjunctive reading of equally weighted provisions. See The New Fowler's Modern English Usage 699 (R.W. Burchfield ed., 3d ed. 1996). Likewise, the semicolons between subsections (A) through (E) in the attempt statute mean something: they provide an interruption of grammatical construction, they signal discontinuity between the subsections, and,

18

most importantly, they indicate there are five distinct factors that modify the Class X sentence for attempted murder.

¶ 54     The "and" between subsections (D) and (E) connects subsections (A) through (D) with subsection (E) to cohere them into a complete sentence, nothing more. It links them into a whole; it does not add them together.

¶ 55     Moreover, the plain text of the statute does not contain a statement clearly indicating legislative approval of a double enhancement. See *Guevara*, 216 Ill. 2d at 545-46 (applying more than one enhancement is prohibited unless the statute clearly expresses that intention). Thus, under the rules of statutory construction, as well as English grammar, a conjunctive reading cannot be adopted.

¶ 56     My view is supported by the court's analysis in *Phagan* and *Holley*. *Phagan* held that the 20-year firearm enhancement imposed by the trial court did not apply to the charged offense of attempted murder of a peace officer. *Phagan*, 2019 IL App (1st) 153031, ¶ 107. The court construed the attempted first degree murder statute and concluded that the statute contains five distinct sentencing exceptions that are mutually exclusive. *Id.* ¶ 103. *Phagan* rejected *Jackson*, *Smith*, and *Tolentino*. It found that a conjunctive reading of subsections (A) through (D) failed to consider the addition of subsection (E) to the attempt statute, which allows the sentencing court to lessen the class of attempted murder under certain mitigating circumstances. *Id.* ¶¶ 92-100. The *Phagan* court explained:

> "*Jackson* relied on the word 'and' to support its conjunctive interpretation of the subsections without taking account of what came after the 'and.' One simply cannot read subsection (A) and subsection (E) conjunctively. Applying the conjunctive reading proposed in *Jackson* to the remainder of the subsections would require us to acquiesce in an impossible

19

reading of the statutory scheme as a whole, an absurd result we are obligated to avoid. [Citation.]" *Id.* ¶ 100.

The court noted that reading the statute conjunctively led to an impossible sentence because the mitigating circumstances that allow for the application of subsection (E) did not apply to the aggravated versions of attempted murder described in subsections (A) through (D). *Id.* ¶ 99. Indeed, logically, how could it?

¶ 57     The *Phagan* court also reasoned that reading subsections (A) through (D) conjunctively would produce an absurd result when a defendant, charged with attempted first degree murder of a peace officer, personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death. In that situation, the sentencing court would be required to impose the 15-year, 20-year, and 25-year enhancements in addition to subsection (A) for attempted murder of a police officer. *Id.* ¶ 101. To avoid both of these illogical results and unintended multiple enhancements, the court read subsections (A) through (E) disjunctively and concluded that only one subsection could apply at a time. *Id.* ¶ 103.

¶ 58     In *Holley*, the court applied a similar analysis and concluded that the legislature intended for subsections (A) through (E) to be alternative sentencing options, not cumulative. *Holley*, 2019 IL App (1st) 161326, ¶ 30. It noted that the State's argument advocated for a "selectively cumulative reading" of section 8-4(c)(1). *Id.* ¶ 31. The State in *Holley* acknowledged that subsections (A) and (E) cannot be applied cumulatively without running afoul of double enhancement concerns but encouraged the court to apply the status-based enhancement in subsection (A) and the firearm enhancements in (B), (C), and (D) together. *Id.* The court declined by stating:

20

"What the State is actually asking us to do is treat subsection (A) as the baseline in [the defendant's] case with a permissible sentencing enhancement to be drawn from subsections (B), (C), or (D). However, this reading would only make sense if the 'and' that the State relies on were placed immediately after subsection (A)." *Id.*

The court determined that the general structure of the statute indicated that subsections (A) through (E) were separate paragraphs with separate applications and found that the trial court erred in applying the 25-year firearm enhancement to the defendant's convictions of attempted murder of a peace officer. *Id.* ¶¶ 32-33.

¶ 59　　　　The majority disregards *Phagan*, but I find *Phagan* and *Holley* to be well reasoned. Following *Jackson*, as the majority suggests, leads to an illogical and unintended result that directly contradicts the prohibition against double enhancements.

¶ 60　　　　Applying the rule of statutory construction, as we must, the first degree murder provision of the attempt statute does not allow for the imposition of a 20-to-80-year sentence under subsection (A) combined with the firearm enhancements in subsections (B), (C), and (D). I would therefore vacate the 20-year firearm enhancement and remand the cause for resentencing.

## No. 3-19-0281

| | |
|---|---|
| **Cite as:** | *People v. Taylor*, 2022 IL App (3d) 190281 |
| **Decision Under Review:** | Appeal from the Circuit Court of Henry County, No. 17-CF-348; the Hon. Terence M. Patton, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Karalis, and Santiago A. Durango, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Catherine Runty, State's Attorney, of Cambridge (Patrick Delfino, Thomas D. Arado, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |